BEAN et al. v. AMERICAN ALKALI CO.

(Circuit Court of Appeals, Third Circuit. January 9, 1905.)

No. 55.

1. CORPORATIONS—STOCK ASSESSMENT—STOCKHOLDERS' LIABILITY—ACTIONS—EVIDENCE.

A corporate stock subscription provided, in accordance with the company's charter, that after payment of $10 per share on the preferred stock the subscribers should not be liable for any balance on their subscriptions, except on such shares as should stand of record on the books of the company in their names when any subsequent assessment was made, but that the holders of shares of record at that time only should be liable therefor. *Held*, that evidence that defendants subscribed for the shares in question as brokers only, that they paid the $10 per share, as required, for their clients, and had the stock issued in the name of their clerk M. as trustee for such clients, etc., and that they had an arrangement with the corporation to obtain subscriptions on its behalf, was admissible in an action by the corporation to charge them with a liability for a subsequent assessment on the stock.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 125 Fed. 823.

John G. Johnson, for plaintiffs in error.

Reynolds D. Brown, for defendant in error.

Before ACHESON and GRAY, Circuit Judge, and KIRKPATRICK, District Judge.

ACHESON, Circuit Judge. The plaintiff in the court below was the American Alkali Company, a corporation organized and existing under the laws of the state of New Jersey, to the use of Arthur K. Brown and Henry I. Budd, Jr., receivers of the company. The defendants were Charles H. Bean and George E. Bean, copartners trading as Charles H. Bean & Co. The suit was an action at law to recover an assessment of $2.50 per share on 2,100 shares of the preferred stock in the company standing of record on the books of the company in the name of George W. Mactague. The assessment was made in September, 1901, by the company itself, while it was a solvent and going concern, and the declared object of the assessment was "for the purpose of providing funds for the completion of the present works, the building of additional works, and providing working capital." The receivership was created under proceedings instituted on September 9, 1903. About the 15th of May, 1899, Charles H. Bean & Co. signed a subscription agreement for 9,700 shares of the preferred stock of the company, of which the above-mentioned 2,100 shares were part. At the bottom

of the subscription was the following memorandum: "Make ctfs. 100 shs. each name of Geo. W. Mactague, 521 Morris St." The subscription agreement specified that the stock was to be paid for as follows: Twenty per centum (or $10 per share) upon 10 days' notice after subscription, and the balance as might be required in the development of the business in installments upon notice. The subscription agreement contained the following further provision:

"Upon payment of the first installment of twenty per cent. the full-paid certificates of common stock and partially paid certificates of preferred stock, setting forth that twenty per cent. has been paid thereon, shall be delivered to the subscribers hereto, and as subsequent installments are paid they shall be indorsed on the latter. Provided, however, that after the payment of the twenty per cent., provided for above, amounting to a total of ten dollars per share, the subscribers hereto shall no longer be liable for any balance of their subscription, excepting upon such shares as shall stand of record on the books of the company in their names at the time any subsequent assessment or calls are made, but the holders of such shares of record on the books of the company at that time, and they only, shall be liable for the same."

The above-cited provision of the subscription agreement, which Charles H. Bean & Co. entered into, was expressly authorized by, and was in strict accordance with, the terms of the company's charter, which contains the following provision:

"After payment of ten dollars per share on the preferred stock, the subscribers thereto shall not be liable for any balance of their subscription excepting upon such shares as shall stand of record on the books of the company in their names at the time when any subsequent assessments or calls are made, but the holders of such shares of record on the books of the company at that time, and they only, shall be liable for the same."

The 20 per centum (amounting to $10 per share) of all the stock subscribed for by Charles H. Bean & Co. was duly paid. The plaintiff's statement of claim, which embodied the subscription agreement, also disclosed the fact that at the time the subsequent assessment here in question was made George W. Mactague was registered on the books of the company as the holder of the 2,100 shares of stock, which are involved in this action. To avoid the effect of this admission, the statement of claim contained the following averment, namely:

"Plaintiffs are informed, believe, and expect to be able to prove, and therefore aver, that said shares were so placed in the name of Mactague for the convenience and accommodation of defendants for the purpose of concealing the real ownership thereof, escaping liability for possible assessments, or for other reasons unknown to the plaintiffs, and that the said George W. Mactague acted in the premises at the request of and on behalf of the said defendants, but without any interest whatsoever in the said shares."

It is quite plain that the plaintiffs' action proceeded upon the alleged ground that Charles H. Bean & Co. were the real owners of the stock in question at the time the assessment or call sued for was made, and therefore were liable for the same. But the alleged ownership of the stock by the defendants was squarely traversed by the affidavit of defense, which set forth that the defendants, in the course of their business as bankers and brokers, subscribed for the 2,100 shares of stock for customers—sundry firms and individuals—upon orders given by them to the defendants; and the affidavit of defense alleged that the defendants never had any right, interest, or property whatever in or

to the said shares, or any part thereof. And, specifically answering the above-quoted averment of the affidavit of claim, the affidavit of defense contained the following statement:

"Deponent further denies that said shares of stock were placed in the name of said Mactague for the convenience or for the benefit or advantage of said defendants, or to enable them to escape liability of any nature or character, or that said Mactague acted in the premises for them, or either of them, but expressly avers that said Mactague acted solely as above stated for the benefit of the lawful owners of said shares of stock, but in no respect for these defendants."

Upon the trial of the case, after the plaintiff's side was closed, and a motion for a compulsory nonsuit had been overruled, Charles H. Bean, one of the defendants, took the witness stand, and testified that the defendants were bankers and brokers, and in that capacity were authorized by their clients to subscribe for shares of stock in the American Alkali Company under the conditions set forth in the subscription paper, and that accordingly the defendants subscribed for their clients the said 9,700 shares of preferred stock; that the defendants paid on account of this stock the first installment of 20 per centum, or $10 per share, by their own checks, but after they had received from their clients the corresponding amount of money to make the payment; that the defendants had no pecuniary interest whatever in the stock except a small stock commission; that the certificates (which were issued in the name of George W. Mactague) as received were delivered to their several customers for whom the stock was taken, and that the entire 2,100 shares of stock involved in this action were so delivered to their clients prior to the 7th of August, 1899—i. e., before the assessment or call sued for was made. The whole of this testimony the trial judge, upon the motion of the plaintiff's counsel, struck out. The defendants then called William W. Gibbs, and offered to show by him that at the time of the signing by the defendants of the subscription paper he was president of the American Alkali Company, and that he entered into an arrangement with the defendants "to obtain subscriptions on behalf of the company, and that as president of the company he had knowledge that Messrs. C. H. Bean & Co., when they signed this paper, were signing on behalf of others." This offer the court rejected. The court directed the jury to find a verdict for the plaintiff, and, the jury accordingly having rendered a verdict in favor of the plaintiff for the sum of $5,880, the amount of the claim sued for, judgment for that sum was entered against the defendants.

Was the court justified in its rulings? It will be perceived that upon the issue of the actual ownership of the stock at the time of the assessment or call the evidence was with the defendants. Now, by the terms of the subscription agreement the defendants bound themselves absolutely only to the extent of 20 per centum of their subscription. That obligation was discharged by the payment of that amount. Thus the defendants were brought directly within the proviso of the subscription agreement, which stipulates "that after the payment of the twenty per cent. provided for above, amounting to a total of ten dollars per share, the subscribers hereto shall no longer be liable for any balance of their subscription, excepting upon such shares as shall stand of record on the books of the company in their names at the time any subse-

quent assessments or 'calls are made, but holders of such shares of record on the books of the company at that time, and they only, shall be liable for the same." No share of stock stood of record on the books of the company in the name of the defendants at the time the subsequent assessment or call was made. The holder of the shares of record on the books of the company at that time was George W. Mactague. He, be it observed, was made the holder of record by the deliberate act of the company, which, in the first place, issued the stock in his name, and then registered him on the books of the company as the holder. What justification was there for the court's denial to the defendants of the benefit of the proviso? Its validity is not open to question by the American Alkali Company. The provision which secures to subscribers a restricted personal liability is expressly authorized by the company's charter. Of any fraud practiced by the defendants either upon the company or the public there is not a particle of evidence. The court, however, ruled that Mactague held the stock for defendants as the absolute owners thereof. The reasons for this conclusion, as stated by the court, are these:

"At the time they signed that agreement, and by writing immediately under their signature, they directed that the certificates for the stock should be in 'the name of George W. Mactague,' who was their clerk, and who admittedly did not own any of the shares."

But these circumstances did not create a question of law for the court to decide, for they admit of more than one inference. From the evidence on the part of the defendants which was received but afterwards was stricken out it appeared that the subscription to the stock was made by the defendants, as brokers, for clients; that the defendants had no pecuniary interest in the transaction beyond their commission; that the purchase money (the 20 per centum) which was paid had been furnished by the clients; that the stock certificates issued in the name of Mactague had been delivered to the owners, the clients for whom the stock was taken, long before the assessment in question was made; that the defendants had no interest, legal or equitable, in the stock; and that Mactague did not hold the stock as agent of or in trust for the defendants. The evidence tended to show that Mactague held the legal title in trust for the persons for whom the stock was subscribed, and who paid the original installment of 20 per centum. The rejected offer was to show that the defendants acted in this matter under an arrangement entered into with them by the president of the alkali company to obtain subscriptions on behalf of the company, and that as president of the company he knew at the time of the subscription by the defendants that they were acting on behalf of others. Neither the evidence received but afterwards stricken out, nor the evidence offered but rejected, tended to avoid the subscription agreement or defeat any of its provisions. The personal liability of the defendants to pay the primary installment of 20 per centum was not the subject of dispute. That payment had been made. The claim pressed against the defendants was in opposition to the terms of the agreement. The evidence under discussion did not contradict the agreement, nor did it add to or subtract from it, or in any wise change or vary its provisions. This evidence directly met the averment in

the statement of claim hereinbefore recited.  The written agreement, as it stands, exempts the defendants from the liability in suit.  The parol evidence was intended to rebut, and was admissible to rebut, an inference sought to be drawn from certain circumstances that the defendants' relation to Mactague and the stock standing in his name was of such a nature as to deprive the defendants of the benefit of the contract stipulation which on its face absolved them from liability.  We are of opinion that the court erred in striking out the testimony for the defendants given by Charles H. Bean, in rejecting the defendants' offer of evidence when William W. Gibbs was on the stand, and in instructing the jury to find a verdict for the plaintiff.

The judgment of the Circuit Court is reversed, and the case is remanded to that court, with direction to award a venire facias de novo.